**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                                        MASTER FILE NO. 12-md-02311

_____

In Re: Wire Harness Cases                                   HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

Direct Purchaser Actions                                      2:12-cv-00101

_____/

**OPINION AND ORDER DENYING COLLECTIVE DEFENDANTS'**
**MOTION TO DISMISS DIRECT PURCHASER ACTIONS**

Before the Court is Collective Defendants' Motion to Dismiss Direct Purchaser

(DPPs) Actions (Doc. No. 228).  The Court heard oral argument on December 5, 2012,

and at the conclusion of the hearing, took this matter under advisement.  For the

reasons that follow, the motion is **DENIED**.

**I.  INTRODUCTION**

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation

transferred actions sharing "factual questions arising out of an alleged conspiracy to

inflate, fix, raise, maintain, or artificially stabilize prices of automotive wire harness

systems" to the Eastern District of Michigan.  (12-md-02311, Doc. No. 2).  In its transfer

order, the Judicial Panel noted that the majority of cases were pending in the Eastern

District, as was the first filed action, that several defendants are located in this district, and that a related criminal investigation was underway in this district.  (Id.)  The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources.  (Id.)

The Court subsequently appointed Interim Co-Lead and Liaison Counsel (Doc. No. 60).  In Case Management Order 1 the Court ordered Consolidation of the Direct Purchaser Actions and instructed the Direct Purchaser Plaintiffs to file a consolidated amended complaint.  (Doc. No. 73).  On May 14, 2012, the Direct Purchaser Plaintiffs filed their Consolidated Amended Class Action Complaint ("CAC"). (Doc. No. 86).

According to Direct Purchaser Plaintiffs ("DPPs"), the class action against Defendants seeks "damages and injunctive relief under the antitrust laws of the United States on behalf of direct purchasers who, during the Class Period, purchased Wire Harness Products, as defined in their complaint, from one or more Defendants."  (Doc. No. 86 at ¶ 1).  Collective Defendants assert that the Direct Purchaser's Consolidated Amended Class Action Complaint must be dismissed for four reasons: it fails to meet the minimum requirements for pleading an antitrust conspiracy; the request for damages are unavailable to DPPs because they are neither automobile manufacturers nor direct purchasers; the statute of limitations bars claims accruing before November 23, 2007; and they are not entitled to injunctive relief.[1]

---

[1]In addition to Collective Defendants' challenge as to the sufficiency of the pleadings, several individual Defendants have filed motions challenging the DPPs' CAC.  These motions are addressed by separate opinion and order.

2

## II. FACTUAL ALLEGATIONS

According to the Consolidated Amended Class Action Complaint, the seven DPPs, Mexican Industries Michigan Inc., Paesana Connecting Systems, Inc., Craft-Co Enterprises, Inc., Findlay Industries, Inc., Cesar-Scott, Inc., Martinex Manufacturing, Inc., and South Star Corporation, directly purchased Wire Harness Products from one or more of the Defendants during the Class Period. (Doc. No. 86 at ¶¶ 16-22). Defendants manufactured or sold Wire Harness Products in the United States. Direct Purchaser Plaintiffs group Defendants by corporate affiliation as follows:

> The Delphi Defendants include Delphi Automotive LLP, Delphi Automotive Systems, LLC, DPH Holdings Corporation, and Delphi Furukawa Wiring Systems LLC. (Doc. No. 86 at ¶¶ 23-27).

> The Denso Defendants include DENSO Corporation, DENSO International America, Inc., and Asmo Co. Ltd. (Doc. No. 86 at ¶¶ 28-31).

> The Fujikura Defendants include Fujikura Ltd. and Fujikura America, Inc. (Doc. No. 86 at ¶¶ 32-34).

> The Furukawa Defendants include Furukawa Electric Co., Ltd., American Furukawa, Inc. and Furukawa Wiring Systems American, Inc. (Doc. No. 86 at ¶¶ 35-38).

> The Lear Defendants include Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC. (Doc. No. 86 at ¶¶ 39-41).

> The Leoni Defendants include Leoni AG, Leoni Wiring Systems, Inc., Leonishce Holding, Inc., Leoni Kabel GMBH, and Leoni Wire Inc. (Doc. No. 86 at ¶¶ 43-48).

> The Sumitomo Defendants include Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., and Sumitomo

3

Electric Wintec America, Inc. (Doc. No. 86 at ¶¶ 49-55).

The Yazaki Defendants include Yazaki Corporation, Yazaki North America, Inc., S-Y Systems Technologies Europe GMBH, and S-Y Systems Technologies America, LLC. (Doc. No. 86 at ¶¶ 56-60).

Lastly, the Tokai Rika Defendants include Tokai Rika Co., Ltd and TRAM, Inc.  (Doc. No. 86 at ¶¶ 61-63).

Collective Defendants include all these Defendants except Asmo Co. Ltd., Delphi Automotive LLP, Delphi Automotive Systems, LLC, DHP Holdings Corp., Delphi Furukawa Wiring Systems LLC, and S-Y Systems Technologies America, LLC, which have been dismissed, and Furukawa Wiring Systems America, Inc., which no longer exists.  (Doc. No. 228 n.2).  Of the seven groups of corporate defendants, four have pleaded guilty: Furukawa, Yazaki, Denso, and Fujikura.  (Doc. No. 86 at ¶¶ 132, 134, 136, 137).

Wire harnesses are electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in motor vehicles. (Doc. No. 86 at ¶ 11).  The term "Wire Harness Products," as used by DPPs, includes wire harnesses as well as the following related products:  automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors used in motor vehicles.  (Id. at ¶ 10).

According to DPPs, Defendants conspired from January 1, 2000, until at least February 28, 2010.  In their Consolidated Amended Class Action Complaint, DPPs include a series of allegations regarding Industry Background (Doc. No. 86 at ¶¶ 76-105); Opportunities to Conspire (Doc. No. 86 at ¶ 106); the Nature of the Conspiracy

4

(Doc. No. 86 at ¶¶107-114); and the Government Investigations and Guilty Pleas.

(Doc. No. 85 at ¶¶ 115-137).  The allegations are summarized below.

In Paragraphs 76 through 105, DPPS describe the nature and purpose of the products at the heart of the alleged conspiracy, how the motor vehicle original equipment manufacturers ("OEMs") procure Wire Harness Products, the size of the industry, the market share of the major manufacturers of Wire Harness Products, the barriers to entry, and the increases in price despite level input costs.

In Paragraph 106, DPPs provide examples of industry events that afforded Defendants the opportunity to conspire.  In Paragraphs 107 through 114, DPPs describe the conduct engaged in by Defendants in support of the conspiracy.

> Defendants. . .participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Wire Harness Products to be submitted to automobile manufacturers in the United States. (Doc. No. 86, at ¶ 108).

> Defendants. . .agreed during those meetings. . .to coordinate price adjustments [and] submitted bids, price quotations, and price adjustments [as agreed, and] monitored and policed their conduct.  (Id. at ¶¶ 110-113).

> Defendants. . .[also kept their conduct concealed by] using code names and meeting at private residences or remote locations.  (Id. at ¶ 114).

Finally, Paragraphs 115 through 137 of the CAC detail the investigations into antitrust activity by the Federal Bureau of Investigation and the Department of Justice in the United States, the Competition Directorate of the EC's raids, and the Japanese Fair Trade Commission's raids, as well as the subsequent charges, the conduct engaged in by various Defendants, the fines paid, and guilty pleas entered by four Defendants and

seven employees.

In the CAC, the DPPs further allege that Defendants' fraudulent concealment tolled the statute of limitations through at least February 2010.  (Doc. No. 86 at ¶ 138). Lastly, DPPs allege they suffered antitrust injury because they paid more for Wire Harness Products than they would have in a competitive market.  (Doc. No. 86 at ¶ 154).

Based upon the alleged conduct by Defendants, DPPs bring a claim of horizontal price-fixing and seek treble damages, injunctive relief, costs and attorney fees, and interest.   (Doc. No. 85 at ¶¶ 155-160, Prayer for Relief).

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief.  First Am. Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007).  "The complaint can contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory."  Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997) (citation omitted).

When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombley, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be

6

detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of a cause of

action's elements will not do.' "  Twombley, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice.").

## IV.  ANALYSIS

### A.  Plausibility of the CAC Antitrust Claim under <u>Twombly</u>

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1.  In

Twombly, the Supreme Court considered the pleading requirements needed to

withstand a motion to dismiss a Section 1 Sherman Act claim.  It held that a complaint

must contain "enough factual matter (taken as true) to suggest" the existence of an

agreement.  550 U.S. at 556.

> Asking for plausible grounds to infer an agreement does not
> impose a probability requirement at the pleading stage; it
> simply calls for enough fact to raise a reasonable
> expectation that discovery will reveal evidence of illegal
> agreement. And, of course, a well-pleaded complaint may
> proceed even if it strikes a savvy judge that actual proof of
> those facts is improbable, and that a recovery is very remote
> and unlikely.

Id.

In addressing the merits of Collective Defendants' position that the claim fails to

meet the standards of Rule 12(b)(6), the Court begins with a general overview of

Twombly, a consumer antitrust class action brought by plaintiffs who alleged that local

telephone and telecommunications carriers conspired to restrain trade.  According to

7

the plaintiffs, the defendants engaged in parallel conduct to "inhibit the growth" of companies new to the market. 550 U.S. at 550. The plaintiffs also alleged that the defendants had agreed not to compete with each other. Id. at 551. The defendants moved to dismiss the complaint because it failed to include factual allegations from which an express or tacit agreement could be inferred. Id. at 552. The Supreme Court observed that "[a]n antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict. . . [and] proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action." Id. at 554 (citation omitted). The Twombly Court added that "at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." Id. (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).

Inasmuch as the Supreme Court dismissed the antitrust claim in Twombly, the decision does not present an example of those allegations that would satisfy the plausibility standard. Nevertheless, the Supreme Court provided general guidance. It indicated that a "heightened fact pleading of specifics" is not needed to state an antitrust conspiracy claim, 550 U.S. at 570, although parallel behavior is not enough. Even as the Supreme Court expressly communicated that a plaintiff was not held to a heightened pleading standard, it observed in a footnote that even if the claims before it in Twombly did not rest solely on parallel conduct, the complaint did not satisfy Rule 8. The complaint merely identified a seven-year window in which the violations occurred; it contained no mention of a "specific time, place, or person involved in the alleged conspiracies." 500 U.S. 545 at n.10.

8

**1. Specificity**

Collective Defendants seize on the language in the footnote and argue that the generic allegations of misconduct in the CAC cannot withstand scrutiny. Specifically they assert that the CAC fails to identify which wire harness products DPPs purchased, from whom the Wire Harness Products were purchased, and which Defendant manufactured, marketed, or sold which product. Collective Defendants conclude that these omissions doom the CAC.

Numerous district court decisions have considered the impact of <u>Twombly</u> on the pleading requirements that must be met in an antitrust conspiracy case, including the who, what, and where argument advanced here. For example, in In re Southeastern Milk Antitrust Litig., 555 F. Supp. 2d 934 (E.D. Tenn. 2008) (examining allegations of conspiracy to set prices), the district court, mindful of the Supreme Court's directive to lower courts that a Sherman Act conspiracy should not be "dismember[ed]" upon review, concluded that specific allegations as to who, what, when, and where are not the litmus test for determining whether a defendant is on notice of the claims. 555 F. Supp. 2d at 943-944 (citing Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 699 (1962)).

> These complaints, while not answering all specific questions about "who, what, when and where," do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist. While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act.

<u>In Re Southeastern Milk Antitrust Litig.</u>, 555 F. Supp. 2d at 943-44. <u>Accord</u> In re

9

Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010) (rejecting the dismemberment approach and observing that the plaintiffs identified the corporate players and executives, the general nature of the agreements, locations and time frames so as to enable the defendants to respond).

Likewise, this Court finds assessing the sufficiency of the CAC boils down to consideration as to whether the CAC includes allegations that inform Collective Defendants what wrongdoing they are alleged to have committed and whether the allegations in the CAC enable Collective Defendants to respond.  See Starr v. Sony BMG Music Entertainment, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the contention that Twombly requires a plaintiff  to identify specifically the time, place, or person related to each allegation of conspiracy); In re Graphics Processing Units Antitrust Litig., 527 F. Supp.2d 1011, 1024 (N.D. Cal. 2007) (confirming that"specific back-room meetings between specific actors at which specific decisions were made" need not be alleged).

Here, the CAC meets these requirements.  For example, in Paragraph 98, the DPPS allege,"Suppliers to [the original equipment manufacturers ("OEMs")] have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process."  (Doc. No. 86). Although the Collective Defendants are correct that DPPs never say they are suppliers, or which OEMs they supplied, DPPs have alleged that they purchased directly from Defendants, and that is sufficient.

In Paragraph 112, DPPs allege that "Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices

for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States." (Doc. No. 86).  Again, although the CAC is not specific as to which parts in particular, and DPPs concede that the price fixing was directed at OEMs, this Court's obligation is not to nitpick the CAC line by line, paragraph by paragraph.  The CAC identifies DPPs (Id. at ¶¶ 58-59); it specifies which products were purchased (Id. at ¶¶ 76-91); it includes the admissions contained in the guilty pleas of four corporate Defendants and seven individuals (Id. at ¶¶ 129-137).  It contains allegations as to the methods of communication used by Defendants and meetings between competitors (Id. at ¶¶ 106, 122-127); the scope of investigations by government entities as well as global coordination of the investigation (Id. at ¶¶ 116, 125).  Taken together, the allegations articulate a plausible antitrust claim.  Not only do Collective Defendants have notice of the claims against them, the allegations create "a reasonable expectation that discovery may reveal further evidence of an illegal agreement."  In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1007-08 (E.D. Mich. 2010).

A review of these factual allegations and the inferences favorable to DPPs, which must be drawn by the Court, stand in stark contrast to the allegations before the court in In re Travel Agent Commission Antitrust Litig., 583 F.3d 896 (6th Cir. 2009), which drew upon purely parallel conduct with "no setting" to suggest the existence of an agreement.  Notably, the CAC does not rest on an allegation of parallel conduct to demonstrate the plausibility of a conspiracy.  Collective Defendants have notice of which Defendants already pleaded guilty and that certain Defendants agreed to rig bids, thereby allocating the business car model by car model.  Collective Defendants know

11

which Defendants are the subject of ongoing government investigations in the United

States, Europe, and Japan.  The CAC identifies the time frame of the conspiracy

through incorporation of the time frames admitted in the plea agreements.  The CAC

identifies market conditions that support the plausibility of a global conspiracy:

Defendants' market shares total over 70% (Doc. No. 86 at ¶101); the market is heavily

concentrated (Id. at ¶¶ 100-101); there are high barriers to entry (Id. at ¶ 103); and

Defendants are capable of producing wire harness products for use in any motor

vehicle (Id. at ¶ 100).  These allegations about market conditions distinguish this

complaint from those dismissed in Twombly and In re Travel Agent Commission

Antitrust Litig..  In contrast to the plaintiffs in Twombly, DPPs have also alleged that

Defendants had opportunities to conspire at automobile industry trade shows, (Id. at ¶

106), and the guilty pleas make clear that Defendants availed themselves of the

opportunities.  These allegations, when combined with the guilty pleas of several

Defendants, support the plausibility of the existence of an agreement among

Defendants.

        In sum, the Court rejects Collective Defendants' who, what, when and where

challenge.  Because the CAC must be viewed as a whole, detailed allegations about

the involvement of each Defendant are not needed.  See In re Flash Memory Antitrust

Litig., 643 F. Supp. 2d 1133, 1142 n.7 (N.D. Cal. 2009) (rejecting the argument

advanced by several of the individual defendants that "the lack of specific allegations

directed at their particular company" required dismissal).  DPPs are not required to

allege the exact nature of the agreements and the extent to which each Defendant

furthered the conspiracy's objectives prior to discovery.  The Court finds DPPs'

allegations of a conspiracy plausible based upon the market structure, the government investigations, and the guilty pleas.  Compare In re Air Cargo Shipping Servs. Antitrust Litig. No. MD 06-1775, 2009 WL 3443405 at *1 (E. D. N. Y. Aug. 21, 2009) (holding that admissions of price-fixing by so many defendants rendered a conspiracy claim plausible).

### 2.  Global Nature of the Conspiracy

Nest, Collective Defendants assert that the DPPs have overreached in the CAC in that the factual allegations do not support the existence of a global conspiracy.  Only four Defendants, DENSO Corporation, Fujikura ltd., Furukawa Electric Co. Ltd, and Yazaki Corporation, pleaded guilty to antitrust violations.  Collective Defendants further observe that Defendants' pleas pertain to conduct concerning different products and are limited to certain automobile manufacturers.  Their pleas cover different time frames, and the pleas do not specify the identity of co-conspirators.  Consequently, Collective Defendants conclude that DPPs failed to link the guilty pleas to specific allegations in the CAC, and dismissal is warranted.

The Court disagrees.  First and foremost, Collective Defendants' reliance on In re Iowa Ready-Mix Concrete, 786 F. Supp. 2d 975, 979 ( N.D. Iowa 2011) is misplaced.  Although the court found that guilty pleas by three individual defendants did not support a conspiracy between eight defendants, the facts are distinguishable.  In contrast to the global market for Wire Harness Products here, the relevant market for concrete was narrowed by qualities of the price-fixed product itself.  Notably, the antitrust allegations involved an essentially local product and the limitations created by short travel time and distance needed for ready-mix concrete pushed the allegations of collusion in a large

13

statewide market from plausible to implausible.

In the case before this Court, it is not necessary to confine the admissions regarding products or time frames to those Defendants that have pleaded guilty. See In re Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1149 (finding the allegations that extended beyond the immediate market to control in related markets supported an inference of conspiracy); In re Static Random Access Memory (SRAM) Litig., 580 F.Supp.2d 896 (N.D. Cal. 2008) (looking at the number of defendants that admitted to price-fixing to support plausibility of a conspiracy claim). Here, the CAC describes the guilty pleas of multiple Defendants and their executives. The executives admitted they met and agreed to allocate supply, rig bids, and fix prices for wire harnesses and related products. The structure of the industry makes it susceptible to collusion. At this stage of the litigation, these allegations are sufficient. DPPs identified the parties to the conspiracy, the products involved, the geographic market affected, and the time frame of the conspiracy. DPPs also alleged methods used to implement the conspiracy. The absence of any admission by a Defendant pleading guilty that the conduct involved an overarching conspiracy does not doom the CAC.

In Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430 (6th Cir. 2012), the Sixth Circuit reviewed the district court's dismissal of an antitrust lawsuit for failure to state a claim. In that case, several of the defendants had conspired to set prices and allocate customers and market shares in the European copper tubing market. The plaintiff's complaint expanded the conspiracy from Europe to one involving markets in the United States. Just as the Collective Defendants argue here, in Carrier Corp., the defendants characterized the complaint as overreaching because it relied on the events in Europe

14

to assert that the anticompetitive conduct happened in the United States.  The defendants also challenged the generic nature of the allegations, which failed to detail the specific involvement of the corporate defendants. The Sixth Circuit rejected the defendants' position and deemed the allegations sufficient.  In reversing the lower court, the appellate court observed that the complaint identified the U.S. entities responsible for selling the overpriced tubing during the relevant time frame.  Id. at 445.

Similarly, dismissal is not required merely because DPPs failed to allege an overt act against each individual Defendant.  Multiple Defendants have pleaded guilty and admitted to meeting and agreeing to allocate supply, rig bids, and fix prices.  The structure of the wire harness industry renders it susceptible to collusion, and the CAC includes allegations demonstrating Defendants' opportunity to meet and collude.

This is not a case involving pure parallel conduct:  the guilty pleas here show something more.  Compare In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896 (6th Cir. 2009) (purely parallel conduct with "no setting" to suggest an agreement); Defendants' plea agreements cover Wire Harness Products as defined by the CAC. Defendants paid large fines.  The fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action.  In re Packaged Ice Antitrust Litig, 723 F. Supp. 2d at 1011.  Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved.  In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 664-665 (7th Cir. 2002).  The key to the CAC's survival is whether it contains plausible grounds to infer an agreement; not whether an agreement is probable.  In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009).  Not only have

multiple Defendants pleaded guilty and paid large fines, those Defendants admitted to meeting with co-conspirators, admitted to making agreements, and admitted to carrying out those agreements.  These admissions, when viewed in light of the allegations regarding market conditions--a concentration of market shares, high barriers to entry because of the high capital investment in plant and machinery and technical expertise (Doc. No. 86 at ¶ 103), the availability of opportunities to collude because of participation in trade shows and organizations (Doc. No. 86 at ¶ 106), and the capability of producing products for use in any vehicle--satisfy <u>Twombly</u>.

### B.  Viability of Claim for Damages

The parties dispute whether DPPs may bring a claim for damages.  In Illinois Brick Co. v. Illinois, 431 U.S. 720, 746 (1977), the Supreme Court considered whether government entities that were indirect purchasers of concrete blocks could recovery money damages from the manufacturers and distributers of concrete blocks.  The manufacturers sold the blocks to masonry contractors, who incorporated the blocks into walls and other structures. 431 U.S. at 726.  The government entities sought damages, alleging that the masonry contractors passed on an overcharge for the blocks to the general contractors, who, in turn, passed along the overcharge to them through the bids submitted for the buildings.  Id. at 726-27.

Even as the Supreme Court acknowledged that direct purchasers might not be willing to bring "a treble-damages suit for fear of disrupting relations with their suppliers," it nevertheless limited damages to direct purchasers.  The benefit of the direct purchaser limitation is twofold:  it eliminates the difficult task of "apportion[ing] recovery among all potential plaintiffs. . .from direct purchasers to middlemen to

16

ultimate consumers," and it eliminates the possibility of duplicative recovery.  Illinois

Brick, 431 U.S. at 728–33.  In addition, the limitation prompts enforcement by those

purchasers suffering most directly from the alleged violation.  Id. at 741–47.  Accord

Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 216 (1990) (declining to create an

exception for indirect purchasers to bring a suit where the amount of the overcharge is

clear).

        In their motion, Collective Defendants assert that DPPs are not entitled to money

damages because they are not direct purchasers.  According to Collective Defendants,

DPPs are not truly "direct purchasers" in any economic sense because the DPPs only

paid allegedly inflated prices because the OEMs agreed to those prices in separate

prior transaction with Defendants.  Thus, DPPs' claims are derivative, and money

damages are unavailable under the Sherman Act.

        Indeed, Collective Defendants are correct about the process by which the

purchase prices paid by the DPPs were established.  According to DPPs, the success

of the cartel turned on its "members ability to control and manipulate the prices paid by

OEMs" as a means of controlling the prices paid by all other direct purchasers.  (Id. at ¶

99).  The OEMs awarded supply contracts based on requests for quotations.  The

process impacted the prices for the entire wire harness products market.  DPPs, as

suppliers to OEMs, had to purchase wire harness products directly from Defendants at

prices established by the OEMs and Defendants in the bidding process, (see Doc. No.

86 at ¶ 98).

        The Court nevertheless rejects Collective Defendants' argument that DPPs'

status as suppliers renders them something other than direct purchasers.  OEMs may

have been the largest group of direct purchasers, but according to the CAC, they are not the only direct purchasers. The CAC contains allegations that each DPP "purchased Wire Harness Product directly from one or more of the Defendants during the Class Period." (Doc. No. 86 at ¶¶ 16-22). The fact that they are not automobile manufacturers does not change the fact that they purchased directly from Defendants. DPPs' admission that the conspiracy was directed at automobile manufacturers, rather than themselves, does not alter their status as direct purchasers.

Further, the simple fact that DPPs were in a direct purchasing relationship with Defendants is not undermined by the decision in Campos v. Ticketmaster Corp., 140 F.3d 1166 (8th Cir. 1998). In <u>Campos</u>, the plaintiffs, who had purchased tickets to music concerts, brought an antitrust action against Ticketmaster, which had exclusive contracts with almost every concert promoter, and handled ticket sales even to those venues with which it had no contract. In affirming the lower court's holding that the plaintiffs lacked standing to sue Ticketmaster for money damages, the appellate court agreed that the concert venues were the direct purchasers, not the plaintiffs. In reaching its determination the court looked at the Supreme Court's definition of an indirect purchaser as a purchaser who is not the "immediate buyer from the alleged antitrust violator[ ]," Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 207 (1990), or one who "[does] not purchase [the monopolized product] directly from the [antitrust] defendant[.]" California v. ARC America Corp., 490 U.S. 93, 97 (1989). Based on these definitions, the Sixth Circuit rejected the plaintiffs' position that they were direct purchases of "ticket distribution services" from Ticketmaster because they paid directly to Ticketmaster distinct service and convenience fees. The panel observed that billing

18

practices were not determinative of indirect purchaser status.  Campos, 140 F.3d at
1171 (citing McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 853 n. 18 (3d Cir. 1996)
(noting that "even if a separate charge for gasoline were assessed [to a taxi passenger],
the taxi passenger still could not be considered a direct purchaser [of gasoline] in any
sense.").

      In the case before this Court, DPPs are not bearing a portion of the overcharge,
they are paying the entire overcharge.  Compare In re Refrigerant Compressor Antitrust
Litig., 795 F. Supp. 2d 647, 653-54 (E.D. Mich. 2011) (distinguishing those plaintiffs that
had purchased compressors directly from the defendant--a group that had standing--
from those plaintiffs that purchased a product that incorporated the price-fixed
product–a group that lacked standing).

      In sum, even though DPPS purchased the offending Wire Harness Products at a
price agreed to by the OEMs, the issue is not whether DPPs controlled the price paid,
merely whether they purchased directly.  DPPs allege that they did, and therefore, the
Court finds they can pursue their damages claim.

### C.  Sufficiency of the Fraudulent Concealment Allegations

      DPPs allege that this conspiracy began in January 2000, almost eight years prior
to the filing of the first direct purchaser civil complaint in November 2011.  Collective
Defendants assert that DPPs are barred by the Sherman Act from recovery on any
claim arising out of a purchase of Wire Harness Products prior to November 23, 2007,
because the statute requires claims be brought "within four years after the cause of
action accrued." 15 U.S.C. § 15b; Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90
(1997).

19

In the CAC,  DPPs allege that the statute is tolled until February 2010 under the equitable doctrine of fraudulent concealment. (Doc. No. 86 at ¶ 138).  To support the application, DPPs must demonstrate three elements:  (1) the defendants wrongfully concealed their actions; (2) the plaintiffs could not discover the operative facts within the limitations period because of the defendant's conduct; and (3) the plaintiff's diligently tried to discover the facts.  Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  Further, the factual allegations must be pleaded with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir.1991).

### 1. Wrongful Concealment

Case law is clear: to show "wrongful concealment," a plaintiff must show something more than silence or an unwillingness to reveal wrongful conduct.  Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League, 491 F.3d 310, 319 (6th Cir. 2007); Browning v. Levy, 283 F.3d 761, 770 (6th Cir. 2002).  See also Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp., 841 F. Supp. 212, 218 (E.D. Mich. 1993) (finding allegations that the defendants engaged in "a pattern of conduct" that "included face-to-face meetings and telephone calls all conducted under the cloak of secrecy" insufficient to establish affirmative acts of concealment).  Allegations of a "trick or contrivance intended to exclude suspicion and prevent inquiry" satisfy a plaintiff's pleading burden.  In Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1467 (6th Cir. 1988) the Sixth Circuit reviewed the elements as set forth in Wood v. Carpenter, 101 U.S. 135, 143 (1879):

> Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.
>
> There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself.
>
> The circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence.

The Sixth Circuit further discussed the distinction between active and passive fraudulent concealment.

> Where undiscovered 'fraud' was the basis of liability, it was universally agreed that no new concealment was necessary and the wrongdoer might remain wholly passive, provided no avenues were open to the plaintiff for discovery of the fraud. But in cases that fell outside the elastic boundaries of the 'fraud' exception new difficulties appeared. To permit suspension of the statute of limitations in all cases where the suitor was ignorant of his claim must have seemed hazardous. Behind the decisions there must have lain a conviction that for suspension of the statute outside the field of 'fraud' there should be added to the suitor's ignorance some affirmative misconduct by the opposite party, preventing discovery and excusing delay. And when the 'fraudulent concealment' exception had once been formulated, the language of the formula itself gave a new direction to judicial inquiries. In examining the factual cases for suspension of the statute they were led beyond a scrutiny of the original cause of action and of the plaintiff's later opportunities for discovery, to an emphasis on the means by which the defendant obstructed discovery.

Pinney Dock & Transp. Co. 838 F.2d at 1468-69 (quoting John P. Dawson, Fraudulent Concealment and Statutes of Limitation, 31 Mich. L. Rev. 875, 880-82 (1933) (footnotes omitted).  The court then cited cases addressing the doctrine in the antitrust context that required allegations or proof of affirmative acts of concealment.  Pinney Dock & Transp. Co. 838 F.2d at 1479.  It concluded that "self-concealment of a conspiracy

21

sufficient to toll the statute of limitations refers to activities in furtherance of the conspiracy which by their nature defy detection."  Id. at 1471-72.

More recently, in Carrier Corp., 673 F.3d at 446-47, the Sixth Circuit reviewed the legal sufficiency of an antitrust complaint alleging fraudulent concealment.  The allegations found to be sufficient in Carrier Corp. were neither detailed nor extensive. The plaintiffs relied on findings from the European Commission that conspirators "established security rules to prevent a paper trail. . .and used a coding-system to hide the identity of the producers in their documents and spreadsheets."  Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated "active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

Here, DPPs allege that Defendants undertook measures to maintain the secrecy of the conspiracy by using code names and meeting at private residences or remote locations.  (Doc. No. 86 at ¶¶ 114, 128).  Further allegations in the CAC include that the Department of Justice alleged that Furukawa and its co-conspirators engaged in communications to "monitor" the conspiracy.  (Doc. No. 86 at ¶ 128).  The use of code names is not passive, nor is monitoring conduct.  Therefore, these allegations satisfy DPPs' pleading burden relative to the first element.

### 2.  Failure to Discover

Next, Collective Defendants assert that DPPs have failed to allege with particularity, facts sufficient to show Defendants' conduct prevented discovery.  The CAC is replete with allegations that meet the pleading requirements.

For example, in the CAC, DPPs allege that Defendants represented to customers and others that "the pricing and bidding activities were unilateral," thereby misleading DPPs as to the true, collusive, and coordinated nature of Defendants' activities relating to bid-rigging, customer allocation, and price-fixing (Doc. No. 86 at ¶ 139).  In addition, DPPS allege that Defendants agreed upon bids and price quotations to be submitted to customers, agreed to allocate the supply of Wire Harness Products sold to customers, and coordinated price adjustments requested by customers.  (Doc. No. 86 at ¶¶140-145).  Here, DPPs allege that Defendants concealed their price collusion by submitting rigged bids to their best customers, the OEMs, and by falsely asserting that the prices were competitively derived, and by selling products to other direct purchases at prices affected by the rigged bids and price-fixing.

Because several Defendants have pleaded guilty to a conspiracy that began in 2000, and that remained secret until the coordinated government raids, DPPs' allegations that they could not have discovered the alleged conspiracy at an earlier time is plausible.  Even if Defendants' focus was on concealing their conduct from OEMs, the focus of their efforts does not undermine the allegations that Defendants' conduct likewise deceived DPPs.   Accordingly, the Court finds the second element satisfied.

### 3.  Due Diligence

In the CAC, DPPs allege that they had no knowledge (Doc. No. 86 at ¶ 149); that they studied prices of the specific products involved (Doc. No. 86 at ¶ 150); that DPPs received various pricing information, but had no way of knowing that prices were higher than they should have been (Doc. No. 86 at ¶ 151).  According to DPPs, they could not have discovered the conduct earlier because of the secret meetings, misrepresenta-

tions regarding the prices charged, secret conversations concerning the allocation of customers, the bid-rigging, and the price-fixing.  (Doc. No. 86 at ¶ 152).

In deciding whether DPPs have satisfied their burden, the Court again uses the decision in Carrier Corp., to guide its analysis.  The Sixth Circuit declined the request to hold that the plaintiffs' efforts were insufficient to satisfy the third element "at such an early stage of litigation and without the benefit of discovery." 673 F.3d at 448-49 (citing Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir.1984) (noting the panel's reluctance to dismiss fraudulent concealment allegations prior to discovery); Duncan v. Leeds, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation). The Sixth Circuit deemed dismissal appropriate if, and only if, "it is obvious from the complaint that the plaintiff conducted absolutely no investigation."  Id., (citation omitted).

Here, there is no basis for finding that DPPs conducted absolutely no investigation.  There is no argument advanced that DPPs ignored available information that would have aroused suspicion and prompted an investigation.  In sum, DPPs have included allegations as to each element that must be proven to toll the statute of limitation.

### D.  Sufficiency of the Injunctive Relief Request

DPPs ask the Court for an injunction preventing Defendants from "continuing and maintaining" the price fixing conspiracy.  (Doc. No. 86, Prayer for Relief at ¶ D). The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in

any court of the United States having jurisdiction over the parties, against threatened

loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  In challenging the

request, Collective Defendants argue that the CAC lacks the factual support necessary

to establish a real or immediate threat that DPPs will be harmed again.  Specifically,

Collective Defendants contend that DPPs were not the target of antitrust activity and

any real threat of future harm has been eliminated by the guilty pleas.  The Court finds

neither position persuasive.

### 1.  Target

Here, for DPPs to attain equitable relief they must show "threat of injury from an

impending violation. . .or from a contemporary violation likely to continue or recur."  In re

New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 13 (1st Cir. 2008)

(internal quotation marks omitted).  Even though DPPs were not the primary target of

the antitrust conduct, they have alleged that they have been and continue to be harmed

by the conspiracy.  As direct purchasers they paid the increased prices paid by the

OEMs.  (See Doc. No. 86 at ¶¶ 98, 99, 112).  These allegations are sufficient, at this

stage of the proceedings, to satisfy their burden to allege the existence of "some

cognizable danger of recurrent violation."  United States v. W. T. Grant Co., 345 U.S.

629, 633 (1953).

The purpose of an injunction is to prevent future violations.  Swift & Co. v. United

States, 276 U.S. 311, 326 (1928).  Collective Defendants' speculation that the OEMs,

now armed with knowledge of the violations, will take steps to protect themselves and

prevent further misconduct, fails to demonstrate the threat of future injury is implausible.

## 2. Guilty Pleas

Collective Defendants contend that the guilty pleas entered by some Defendants render continuing antitrust conduct implausible.  In light of the allegations in the CAC, the Court finds DPPs have stated a claim for injunctive relief.

DPPs allege a decade-long global conspiracy in a market with high barriers to entry.  The same market conditions exist today.  See In re Static Random Access Memory (SRAM) Antitrust Litig., 264 F.R.D. 603, 611 (N.D. Cal. 2009) (certifying a nationwide class for injunctive relief based upon similar allegations).  Not all Defendants have pleaded guilty.  Simply put, the pleas entered by certain Defendants to "not obviate the threat that a conspiracy will persist or resume in the future."  In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 597 (N.D. Cal. 2010) amended in part, M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (certifying a nationwide injunctive class under Rule 23(b)(2)).

The case law cited by Collective Defendants is distinguishable in that the request for injunctive relief was awarded at the summary judgment phase, not the Rule 12(b)(6) phase of litigation.  See e.g. U.S. v. W.R. Grant Co., 345 U.S. 629, 635 (1953) (affirming the trial court's refusal to grant injunctive relief because no factual dispute about the existence of such a threat); Dart Drug Corp. v. Parke Davis & Co., 344 F.2d 173 (D.C. Cir. 1965) (affirming the lower court's award of summary judgment to the defendant).

This Court is not in a position, at this stage of the proceedings, to render an assessment that injunctive relief cannot be had.  Accordingly, the Collective Defendants' request is denied.

26

**V.  CONCLUSION**

For the reasons discussed above, the Court **DENIES** the motion.

**IT IS SO ORDERED**.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATE: June 6, 2013

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager

27